We move next to the appeal of the United States of America v. Kemp at Powell Arena. You are proceeding first. Good morning, Your Honor. I'm Kevin Marino. I'm the deputy defense. With respect to the first issue to be discussed today, which is the insurance removal issue, I would like, with your permission, to reserve two minutes for rebuttal time for myself, two minutes for rebuttal time for Mr. Rustler, who will argue the variance issue, and two minutes for rebuttal time for Mr. Lewis, who will argue the aid and vetting issue. Unless I hear vigorous and convincing objection from either of my colleagues, no. Thank you very much, Your Honor. Your Honor, we respectfully submit that the Ninth Circuit correctly answered the court's question regarding the quantum of evidence required to discharge a juror when it held, in the United States v. Sandington, that if the record of evidence discloses any reasonable possibility that impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror. Is that effectively a beyond-the-reasonable-doubt standard? It is, Your Honor. It is a standard by which the court would have to be firmly convinced, and it is clear that if there is any reasonable possibility in the record, that if the record of evidence discloses any reasonable possibility that the complaints about the juror in question stem from her view of the evidence, she just cannot be removed from a crafty-nasty legal standard which focuses not on the elusive question of a juror's competency, a juror's ability to understand and to deliver, but on the impetus for her removal, why the evidence found her competent. The Sandington test is appropriately attentive, as that court noted, to the twin imperatives of preserving juror secrecy and safeguarding the defendant's right to a unanimous verdict from the impartial juror. All right, let's assume that we adopted the Ninth Circuit standard, and I think it's Sandington in which Judge Fletcher indicated that the standard was equivalent to a beyond-reasonableness standard. Yes, Your Honor. How does that help you here? How does that standard work for you in this case? Because the record of evidence in this case clearly reveals a reasonable possibility that the impetus for a juror's removal stemmed from her view of the merits. In making that determination, do we look at just the second colloquy with the juror? Or do we look at all three colloquies in their totality and ask whether your standard is met? I would suggest, Your Honor, that Your Honors not only look at all three colloquies, but also at the entire circumstance in which all of this arose, the notes themselves. The second colloquy, I think, is much stronger for your position, isn't it? Well, I think, actually, Your Honor, that in the third colloquy, where Juror 5, frankly, I think this disposes of the question if the court qualifies the Simonton Rule. In the third colloquy, one of the jurors said, referring to Juror 11, I don't think she's refusing to follow the instructions. She has her own interpretation of it. When Judge Belson asked if Juror 11 was biased, that juror said, Bias is such a hard word. I don't think she's biased. I think that she just has different beliefs about believing some of the truth. I don't think she's totally biased about any parties, but she just has her own beliefs about certain things, about certain things that persons may be lying about. And when pressed further, I don't think she's biased. I think that the fact that she's not believing all the evidence is so that the person would be telling the truth about certain things, but I don't think she's biased against any particular person. But you take that in tandem with the other colloquies, and it's modulated considerably. It is modulated, and I would suggest to the court that it's modulated for a reason. When the very first inquiry arose in this case, it came by way of a note from the jury foreman that said, it closed another note, and it said, the person mentioned in this note is making the rest of us retry the case in the jury room. And nobody in question made reference to a juror's discussion of the evidence that someone who was a witness was on chemotherapy. All right, but that was the trigger to the inquiry conducted by the district court. That is correct, Your Honor. And that's governed by our Boone decision of last year. There's no issue as to, as I understand it from your side, the actual process that the district court followed here. But, Your Honor, in Boone, the court made very clear that it was leaving open the question that is presented. The standard of proof, of course. But this circuit has a pretty liberal standard, as it was articulated and restated in Boone, that permits trial court inquiry into this type of problem brought to the attention of the trial court. I do believe that. Yes, I do, Your Honor. But what the court said in Boone, and it was clear about this, in calling for a carefully circumscribed inquiry, that certainly makes sense when there's a claim of juror bias, to have that kind of a circumscribed inquiry. It bears no relation to what transpires here. Here, on the first colloquy, you have the questions asked, which the judge felt he was appropriately asking, within the circumscribed, small class of questions that could be asked. Is anyone refusing to deliberate? Is everyone discussing the evidence? Is everyone following my instructions? Mr. Marino, we're dealing for abuse of discretion, right? Yes. And we have, by my count, eight jurors who stated, in clear terms, that juror number 11 violated her duty to deliberate in good faith, and to not have preconceived bias. I think, Your Honors, has to read the abuse of discretion standard carved out by Judge Fletcher as a very particular standard with a very limited applicability. If we don't accept the ninth Judge Fletcher standard, because it's been criticized on the point that, as they say, anything is possible. You know, you can say any possibility. Anything is possible. But the more deferential standard of no reasonable possibility, if we adopt that standard, would your argument still hold water? Yes, Your Honor. Why don't you argue on that more reasonable possibility standard? The Ninth Circuit tends to be a little bit more liberal on many things, including criminal law. How do you take it? Yes, but I've been on the Ninth Circuit a number of times. I've been amazed. Why don't you straighten them out? I didn't hear it. Judge, if I may, it actually is the Ninth Circuit, and specifically Judge Fletcher's majority opinion in the Ninth Circuit, that carves out the reasonable possibility standard. It was the Second Circuit's decision in Thomas that spoke in terms of any possibility. And in refining that standard, it was the Ninth Circuit, and specifically Judge Fletcher, that said any reasonable possibility, because anything, as Your Honor observes, is possible. But in this circumstance, and I think this is absolutely critical, it's not just a waning of evidence. The district court abuses its discretion when it removes a juror despite the fact that there is a reasonable possibility that the impetus for her removal stemmed from her view of the evidence. You could not conclude otherwise. Judge Balson, in this case, did take the approach that is being described. He looked at this as a whole. He found Juror 11 not to be credible. He found all the other 11 to be credible. Those credible statements, the statements credited by the judge, included questions that they asked. Remember, they asked him, they told him after the second column, he didn't ask the right questions. And then a question went out from the court to the jury. Well, what questions should we ask? One of those questions was, is everyone being logical? Is everyone acting reasonably? Which Mr. Moreno, too, along with the application of the abuse of discretion standard, which we all agree is applicable here, this court has, again, recently, in November, said a district court, based on its unique perspective at the scene, is in a far superior position in this court to appropriately consider allegations of juror misconduct. Now, I'm not going to call that a heightened abuse of discretion standard, but certainly we need to pay heed to that language of abuse of discretion when we apply our abuse of discretion standard. I agree with you, Your Honor, but I think it's very important to take a look at the record in this case and ask exactly what did Judge Balson do. He certainly did not scour this record for any reasonable possibility that the evidence for Juror 11's removal was her view of the evidence. He certainly did not. But he formulated a set of questions, certainly designed, and speaking only for myself, seeming to do a fairly good job at separating the permissible inquiry into the actual manner in which deliberations were being conducted and this juror participated or did not participate in them from the very highly problematic and certainly intrusive type of inquiry that would have gone to consideration of the evidence here. And he inquired as to every single member of that juror, and then eventually, as I understand his calculus, preponderated the responses that he received from all of those 11 other jurors, together with the responses, and he would seem to have got some rather inconsistent responses that were in tension with one another from Juror 11. Where is the abuse of discretion? The abuse of discretion is here, Your Honor. If the question presented is, was there any reasonable possibility that the evidence for Juror 11's removal stemmed from her view of the evidence, I want to submit to the Court that what should have been done here was the Court should have searched the record and should have searched the testimony of these jurors for any reasonable possibility. Why is that the standard? Why does it make sense? Because, as the Ninth Circuit said in Simonton, in the very rare circumstance where a request for a juror's removal stems from the quality of her deliberation, the quality of her communications with her fellow jurors, it often will be the case that you just can't ask enough questions to really satisfy yourself if there's no reasonable possibility. We can all agree that Judge Benson did not have the benefit of this Court having set forth the burden of proof because that was explicitly cut out and not reached in a footnote in Boone. Can't we simply look at the record of the inquiry of all these jurors and make that determination in a court of appeals subject to the abuse of discretion standards? Your Honor, certainly you could look at the record, and I urge the Court, and I know the Court has done so, and I urge the Court to continue to do so, to look at the record of this case and see exactly what it is that that record reveals with respect to the reasonable possibility that the impetus for this juror's removal stemmed from her view of the evidence. Assume, for the purpose of argument, that the judge has a consensus that most of the jurors, or just say, well, I'll let it, but one juror or more, I'm going to say one, believes that, look, the guy is just not agreeing with me, he doesn't look at the evidence the same, and we have a difference as to what the equality evidence is. But the other 10 say, look, he's just a loggerhead, he won't negotiate, he won't listen, he won't do it. Can the judge, under the no reasonable possibility standard, determine by a consensus that the jurors have determined that the juror will not discharge her duties? Surely. So if only one juror says to the contrary, the judge can reasonably conclude that, look, 10 say the juror is not discharging her duties. If the judge is satisfied from the record evidence that there is no reasonable possibility that the impetus for the juror's removal stemmed from her view of the evidence, look at what happened here. What I'm honing in on is if there's a difference in the jurors who complain, but 10 of them or a consensus of them say the juror will not negotiate, will not listen, will not hear anything, will not. But one or more say, look, he sees it one way, she sees it one way, I see it the other. Can the judge by making a, under the more deferential standard of no reasonable possibility, say, look, the juror is not negotiating, is not discharging her duties? Well, Your Honor is asking a question which, if you transpose it to the reasonable doubt area, if you, for example, said, well, if 100 witnesses testified in the case, or even 12 witnesses testified in the case, did the no reasonable possibility standard translate into a unanimity requirement? It is not a consensus requirement among the other jurors. Well, it's not a unanimity requirement. So you should say it up. But here, Your Honor, Judge Belson specifically found that the 11 other jurors were all credible. And so you have the unique circumstance in which the district judge is crediting people who said, she just wasn't equipped enough. And he mailed an explicit finding of lack of credibility as to juror number one. Yes, and I would ask the court to disregard entirely everything the juror 11 said. Let's accept entirely Judge Belson's conclusion that she was covering her tracks, that she was in denial, she was offensive. Take it all out. Look instead at the 11 he found credible. And look at some of the things that they said. She's just not logical. A reasonable application would not be to cut out the juror that everyone's talking about here. Reasonably is looking at the whole universe of what you're dealing with. But Judge Belson found he did not credit her testimony. If he had credited her testimony, he would have come to a different conclusion. He disregarded her testimony. And I would suggest to Your Honors, and this is the problem in a circumstance such as this, it's a very unique class of cases in which the juror removal is tied to her view of the evidence. Just think about this. No less significant an issue than a jury survival of the jury system turns on the extent to which a court can save the province of the jury room and say to those jurors, I want to ask you questions. They'll be circumscribed. But let's find out if the juror you're complaining of is really an incompetent juror. It's a unique circumstance. There's no cross-examination. There's no direct examination. This is a circumstance in which the inquiry is limited. So you're preaching to the choir on that when you have three former trial projectors here. Your Honor, so think about what happened. We're precognizing the inviolability of jurors. And sanctity of the jury of the province. If I may, Your Honors, quickly, very briefly. Because we're going to have you back. I know that you will, and I appreciate that, sir. Let me just say this very briefly, though. In this circumstance, initially you had a juror note that questioned the motivations of Juror 11 because she was saying things that were not logical about the evidence. Throughout the three colloquies, that persisted. And in the very end, after the judge had re-instructed and engaged in an unprecedented dialogue with the jurors, at the third colloquy, at the third voir dire, you still had jurors saying, she's just, I wouldn't say she's biased. I wouldn't say she's reasonable. We know what the record says. And we'll have you back. Thank you, Your Honor. Thank you very much. Thank you, Mr. Lustberg. Good morning, and may I please the court. My name is Lawrence Lustberg, and I represent the appellant, Polk and Umbrell, with respect to the question that his court has denominated the variance question. And in other words, the question is whether the government proved that there was a single conspiracy as alleged in the indictment or multiple conspiracies as we claim on appeal. That, of course, is the fundamental issue before the court with respect to this matter. And it is an issue that is before the court either as variance or as deficiency of the evidence. If you examine this court's jurisprudence and other court's jurisprudence as well on this issue, you see them speak in terms of variance as the court's letter indicated. But it quickly, and usually the next sentence or two, devolves into the inquiry of whether any reasonable juror, given all reasonable inferences to the government, whether any reasonable juror could find that there was, in fact, a single conspiracy as opposed to multiple conspiracies. We respectfully submit that the government failed with respect to that proof in this case. Would you say we have a public-spoke conspiracy? Absolutely. Absolutely. No, that's the original. That's our claim. And that language, of course, emanates from the Supreme Court's decision in Kodiakus as it's been interpreted through the ages by this court, by the Supreme Court itself, and by the other circuit courts of appeal. All right. If that be the case, Mr. Mossberg, and this was not a single conspiracy, is it your position that if this had been planned as a single conspiracy or multiple single conspiracies, that there was insufficient evidence to show that your clients were in conspiracy with the hub and that there was sufficient proof to prove that that conspiracy was proven? Your Honor, for purposes of this argument, we assume arguendo that there was sufficient proof of the single conspiracy that was what the Commerce Bank spoke, let's call it. Yes. So at the hub of this conspiracy, that's alleged in the indictment, that one is alleged, and that's critical because, of course, the defendants have the right to be tried on the conspiracy that was actually alleged in the indictment and found by the grand jury. That's a critical constitutional preset that underlies all of this. That one conspiracy is the conspiracy as to which we say there's insufficient evidence. We concede arguendo that there's sufficient evidence giving all inferences as they should be to the government for purposes of this appeal. Is the variance question really nothing but a different form or even different term for a specific type of sufficiency in the evidence inquiry? That's correct, Your Honor. That is absolutely correct. And I actually went through all the cases yesterday and very frequently in this circuit, what the court will say is... There's a conflation often. Yeah, the court will say, we first turn to the variance issue. The standard proof for the variance issue is whether any reasonable juror can find it. And that's sufficiency in the evidence inquiry. Absolutely. Let's assume, let's assume arguendo that there's a variance here. How are Holt and Umbrella prejudiced? Holt and Umbrella are prejudiced in ways that go beyond what the government states in its letter to the court. They're prejudiced in three ways. First, and fundamentally, if there's insufficient evidence to support a count that is alleged in the indictment, then pursuant to Rule 29 and the due process clause of the Constitution, they have a right to a judgment of acquittal. Second, they're prejudiced because, as I mentioned a few moments ago, they have the constitutional right to be tried under the Fifth Amendment grand jury clause on the charge that was actually returned by the grand jury. But I think what the court is actually asking me, Judge Smith, correct me if I'm wrong, is there was really an issue here. The real prejudice is spillover. And when I talk about spillover, I talk about... What other prejudice can there be in this kind of a conspiracy? And if I could just speak in a common-sense fashion about what occurred here. What occurred here was that for weeks and weeks and weeks, Mr. Marino and I, representing Mr. Holk and Mr. Umbrell, sat there in that courtroom and listened to evidence that had absolutely nothing to do with us. We get you, did you not, in a highly structured trial, structured in the sense of how the evidence was presented and against whom, that was offered pursuant to a very structured indictment. I don't, frankly, enjoy spending a lot of time reading 160-some page indictments, but I did in this case, to start out. And it seems to me that there was a fairly disciplined compartmentalization of both the charges and, more importantly for your purposes here, the presentation of the evidence. To respond, that's correct. The trial was preceded in an orderly fashion. And Mr. Salzman, in his response to the court's inquiries, has specifically pointed out that that is absolutely correct. Does that lessen the probability of spillover of the evidence? It doesn't for two reasons. The first reason is that the court will recall that we filed motions in limine before the trial to keep out all of that evidence as against us. The government fought tooth and nail to get all that evidence in. And at the end of the day, Judge Bailson specifically held that that evidence was admissible as against us. So that even though the trial proceeded in that orderly fashion, and even though the government, in its summation, did not make reference to that other evidence in its section of the summation that applied to us, the court, in its jury instructions, specifically told its jury that all of that was admissible against all of us. Refresh my recollection here as to what the offensive evidence was that came in and would, according to your argument, be prejudicial. Of course. Under the Hub and Spoke conspiracy, there was a huge amount of evidence of deals between the other spokes and the Hub, which was Ron White and Corey Kemp. Some of these deals were extremely unsavory. There was money that flowed for Super Bowl tickets for the NBA All-Star game. You're not suggesting that the evidence that probably came in against Polk and Umbrell was entirely savory, I hope. Well... There was a sense of lack of savor throughout the record that I'm familiar with. This was a terminal case, Your Honor. The... It's why there's so much in here. It's sort of a blast. I know it was easy for me to say, I'm sorry. The evidence was of a different kind. There was no evidence in the Polk and Umbrell part of the case of nights in hotel rooms with girlfriends. There was no evidence of decks being built on people's homes by people who were trying to curry favor with the City Hall. There was no evidence of flights across the country to the Super Bowl for tens of thousands of dollars. Our part of the case was about a single question, which was, did Commerce Bank extend loans, by the way, on legitimate terms of interest and under... that had to be repaid back, not bribes in disguise, but actual loans to Mr. Kent, and in return get benefits for Commerce Bank. That was what the case was about. Did the court instruct the jury that if they found that there were separate conspiracies, that they should acquit on this? Yes, Your Honor. Did you have some objection to that? Pardon me? You had no objection to that? No, the court was required, the district court was required as a matter of law to give an instruction that questioned, that said to the jury that if they found that there were multiple conspiracies instead of one, that they had to acquit after count one. It's for that reason, as Judge Smith has pointed out, that we really are here on a sufficiency of the evidence inquiry at which, of course, this court has clear review. But if this had been a single conspiracy, you acknowledge there would have been sufficient evidence to convict your clients? I acknowledge for purposes of this argument... Of this argument. ...of this argument that, obviously, in parts of our brief, we have taken issue with whether there was sufficient evidence with respect to the honest services and the outright count against them. But for purposes of this argument, our argument is not that there was insufficient evidence of that spoke, only that there was not sufficient evidence, that there was insufficient evidence of the writ that was needed in this case. If we determine that there was no single conspiracy as such that your clients were in, that this wasn't a single conspiracy, then we go to the variance question, and a substantial part of that question is whether or not you were prejudiced at all. Right. Now, who has a burden of proof or persuasion for us as to whether or not you were prejudiced by reason of being tried in a single conspiracy when, in fact, there was proven a multiple conspiracy? We didn't. You haven't. OK. Absolutely. If you have that... Now, the government posits that it's a very structured trial, that if there were multiple conspiracies, they put in separate spokes. They never complained to the spokes, that they summed up individually. They never said that Hawkins said this, therefore, your client is guilty. They never utilized any of the other co-conspirator statements, which should not have been in that multiple conspiracy situation. So how does that test out as prejudice that you suffered by reason of being charged in a single conspiracy when you should have been charged in multiple conspiracies? The court doesn't mind that. I see that in a matter of time. We rarely pay attention to the lighter end. I appreciate that. I really do, either. There is a difference, though. I will... I'll complete that one, too. Let's take a hypothetical. In my little town that I live in of Chatham, New Jersey, there's a hardware store dealer who gives out spray paint, cans of spray paint, to Person A and Person B, who then go and vandalize the local elementary school. He also sells spray paint cans to Persons C and D, who go and vandalize the train station, and Persons E and F, who vandalize some other building in town. An indictment is brought that alleges that this is all one conspiracy. However, the government's proofs are carefully segregated so that the case against A and B comes first, and the case against C and D comes second, and I represent Persons E or F, who comes third. By the time we get to my part of the case, what the jury has heard, even though there's no evidence under my hypothetical that any of them knew what the others were doing, even though they're linked at a common core, which is the guy who sold them the spray paint cans, under my hypothetical, by the time we get to the trial of E and F, the jury has heard about an enormous social problem, the vandalism of buildings in Chatham, New Jersey. But if what you say is true, then there never would be a variance where there would be a conviction, because you're saying it's a matter of fact. There could never be a single conspiracy trial where it was improper, where there should have been multiple conspiracies. No, no, I disagree. There would be plenty of trials where there would be no spillover. But here, there is tremendous spillover, and you can tell that by what happened with respect to Mr. Hawkins. Mr. Hawkins was part of the conspiracy as well. He had one spoke of the conspiracy. But his part of the conspiracy... He was acquitted of it. He was acquitted of it. And why was he acquitted of it? He was acquitted of it because that spoke had nothing to do with this exchange of benefits with City Hall. It had nothing to do with buying business from the city. It had to do instead with his trying to get Mr. Campbell, some representative of the city, to vouch for him in a separate business deal. There was no spillover because the nature of what he was alleged to have done was so different. But in my vandalism example, having sat through all that, I'm sure he's going to contextualize what's before them as something that is part of a bigger conspiracy, even though it isn't. Here's the truth. In this case, Your Honors, there was no... I mean, this is... You talk about the sufficiency of evidence standards. We're not dealing here in the realm of inferences, in the realms of disputed testimony. There was no evidence that Mr. Holt and Mr. Umbrell knew what any of those other spokes were up to. There was no evidence that they knew those spokes even existed. But you're crying the most praise. This is from the Hawkins part of the case. No, no, no. Not at all. No, no, no. What I'm claiming is the prejudice comes from the fact that all of this evidence of corruption at City Hall came in so that although the presentation was segmented, although the presentation was organized, by the time it got to our clients 3 or 4 weeks later, what the jury was thinking was this must be part of this big corruption problem that City Hall has. That is spillover, and that is the fundamental prejudice that we claim, which we've described as well in our letter to the court. All right, Mr. Westbrook, we'll have you back on the phone. Thank you, Your Honor. Judge Lewis. Good morning, Your Honor. This is an appeal to the court. Tim Lewis on behalf of LeVan Hawkins. Let me just say at the outset that it's a special honor for me to be here this morning. Thank you. If the court will indulge me for just a moment, I know that I have been directed to address the sufficiency of the evidence to aid me in that in effect with respect to Mr. Hawkins. I just want to say 30 seconds about the jury level issue. Mr. Hawkins adopts all of what Mr. Rubino has presented, but I think that it's important to point out that there is a serious question as to the extent to which a district judge may go to avoid a mistrial. I would ask the court, and this is a very critical issue to all the defendants here, but it's also a critical issue to the district judge and the circuit who have to be. I would ask this court to pay close attention to a note that the judge received on April, I believe it was September 25th, when the jury had been out deliberating for a period of time during the first inquiry. And then after that inquiry, he sent a note back thanking the judge  And then over the weekend, apparently a jury changed its judge or changed their mind. And the judge received a note saying, essentially we are hoping to be deadlocked further deliberations will not be helpful. In my experience, and based on what I've seen over the years, at that point, the judge has two options. He can declare a mistrial or grant an Allen instruction. Neither one of those happened here. Instead, the second inquiry happened. I would ask the court to pay close attention to that in discussing the extent to which these inquiries were proposed. On the question of aiding and abetting, we contend that the evidence was not sufficient for Mr. Hawkins' conviction, in particular because, as this court knows, the issue is the evidence that was before it was introduced by the government with respect to Hawkins' knowledge of the fraud and intention to aid and abet it on October 10th, 2002. For my purposes, the inquiry that was posed by Judge Baleson, in his opinion, I believe in support of the denial of post-mortem motions, really frames our inquiry here. And he asked, very succinctly, why would Hawkins make very substantial payments, $10,000 in total, to a Philadelphia public official at the request of a Philadelphia lawyer who wishes to conceal that he is the source of at least one of the payments? Well, Your Honor, it's a fair question, but it's not Mr. Hawkins' burden to prove that the reason for those payments was the scheme that's alleged in the indictment. No, instead, what he is stuck with, or not stuck with, are any reasonable inferences that can be brought. There are many. There are very many. As a matter of fact, I did not try this case. When I first reviewed this case, my sense was, geez, I wonder if there's some money laundering going on here. Could that have been what was really happening? We don't know what happened. Suppose, for example, now I will concede that, as I believe Your Honor pointed out, there may have been something, it appears anyway, that things were not necessarily on the up-and-up across the board. But we don't know what those payments were. The government did not... Even though there are several possibilities, if any one of them is reasonable, the jury picks a reasonable one, even though there are others that would be reasonable, or a jury could select, that's not sufficient to nullify the burden. No, that's... Your Honor, that is not consistent with the progeny... policy since 1978 in the circuit with respect to what's required for the government to establish an improving fraud such as this one. They must establish a specific scheme that is charged with indictment and that the defendant, on the date that the active event occurred, was aware of and intended to perjure that specific fraud. Why could the jury assume that someone's giving a type of money to a public official and who wants to do some sort of business or do favors for the government is trying to corrupt the government and so forth? It's not a reasonable, maybe not the only conclusion to jury control, but it's not a reasonable one? Absent some evidence that Mr. Hopkins was aware of the scheme on that date, under the case law in this circuit, to answer your question, Judge Collins, no. Well, but there is evidence of several lies that Mr. Hopkins told, untruths that the jury has a right to consider and under our evidentiary jurisprudence draw inferences from the... as to the consciousness of guilt from the fact that it's untruths. And isn't that also supportive of this particular substantive charge, the aiding and abetting charge against Hopkins? There's no question but that, as I think the government is putting out in its briefings, I think we acknowledge that under universal rehabilitation services, the court may look at and the jury may look at post, in this case, wire transfer events to determine the extent to which they may shed some light on intent. However, absent evidence of specific intent on that particular date, along with anything that may have happened afterward, may have happened post-wire transfer, such as in this case, a grand jury testimony that you're only referring to, that is simply not enough. In addition to that, I'm going to point out that when Mr. Hopkins testified in the grand jury, he was not made aware that the grand jury was investigating this particular scheme. If you take a look at the U.S. Attorney's discussion as to what the grand jury was there to do that day, he states as follows, the grand jury... Do you have one that is there? Yes, Your Honor. It's on page 49 of Mr. Hopkins' grand jury testimony, A055... There's 5442 in the record. The grand jury here and the FBI and the United States Attorney's Office have written into a number of matters, one of which is the two checks that you wrote to an individual named Corey Kemp, who is the treasurer of the city of Philadelphia. Do you understand that, Mr. Hopkins? That was it as far as what he was told they were investigating. Now, his answers to the questions posed were interesting, but did not in any way suggest that he was aware of the alleged scheme prior to October 10th, which is the only wire that he was convicted of in this case. He certainly made the wire transfer and he certainly provided $10,000 to Mr. Kemp. The question is, did he know what Mr. White and Mr. Kemp were up to at that time when there's no evidence? And, Your Honor, it is true, Judge Callan, that reasonable inferences may be drawn, but they must be drawn beyond a reasonable doubt. And absolutely any evidence whatsoever consistent with the Idolo case, Judge Becker's opinion, where you had a drug dealer carrying a suitcase that he owned that had documents that were personal documents in it containing some $30,000 sitting in a car while a drug deal was happening. In that case, Judge Becker said there was no evidence that he knew that the money was for the drugs that had been brought for him to purchase at that time. But why would someone give a public official when he wanted to do business with the government that type of money for a public stranger? I mean, couldn't a juror reasonably conclude that this is to corrupt a public official? Your Honor, we don't know whether or not Mr. White approached LeVan Hawkins and said, Mr. Motley, this guy is going to run for mayor of Philadelphia in two years or three years, and I'm going to set a slush fund for him, and I want you to contribute to it, $5,000 here, $5,000 there, so that when he is the mayor of Philadelphia, he is going to give you all the favors that you want. That's still legal. That's wrong. But that's not what he's charged with in this indictment. We don't know that, for example, Mr. White approached Hawkins and said, I am making gifts of $5,000 periodically to Kim, but I want to give him $15,000, but I don't want to pay gift tax on it, and so give me $5,000 here. He has no idea, there's no evidence in this record whatsoever to suggest that during his payments, Mr. Hawkins was aware of the scheme. In spite of the reasonable inferences that Your Honor is referring to that may be drawn because it's money going to a public official, that under the case law in this circuit is not enough. There has to be specific evidence of intent at the time the transfer is made and knowledge of the overall scheme. There is not, absolutely not, in that case. Was there evidence that White ever gave Hawkins some money before that time prior transfer? There is evidence that White owed Hawkins, according to his unrefuted grand jury testimony, some $40,000 at one time, that he frequently paid White money to give to people around the country that White was working with to start companies, to, White was a lawyer, of course, and apparently involved in a lot of things, to support politicians, to hold a fundraiser in Atlanta for the mayor of Philadelphia and Mayor Street that White owed Hawkins money, that Hawkins paid. They were business partners in a sense over a period of some 10 to 12 years. Mr. Hawkins was a very successful, long-standing entrepreneur that the largest black franchise owner in the United States. Hawkins gave up $5,000 before claiming it was White's present. Correct. How close was that to the time of the wire transfer? That was in March of 2002. The wire transfer was in October of 2002. And Hawkins testified in the grand jury that he wasn't sure why White was giving him a $5,000 check in September of 2002, that it might have been for repayment toward the $40,000 outstanding loan, that it might have been for repayment of the September, excuse me, the May, March, check. He didn't know. But the reason he didn't know is because it's not at all unusual for them to be engaged in this kind of business according to his grand jury testimony, which, as I said, was read and undisputed during trial. Thank you. We'll have you back. Thank you. Thank you very much. Mr. Sosner. Was this trial  as Mr. Osberg says it was? It had its moments,   be quiet for a moment and then I'll get going. Your Honor, may I please be quiet for a moment and then I'll get going. Your Honor, I'm Sonny Osmoor on behalf of the government. I'll begin with the issue regarding the juror dismissal and then bill and order. With respect to the standard, I do not want to spend much time on that. We do nitpick a bit regarding which standard is that, but in the end it doesn't matter because the District Court applied the highest standards that one could contemplate. It actually went beyond the standard that is in Sonnington. The Sonnington standard says no reasonable possibility that the juror is being dismissed because of her view on the evidence. The judge looked to the Brown case which came earlier which said no possibility at all. And that was the standard that the judge consistently applied in taking his time in evaluating this issue. Just briefly on the standard, Sonnington says that its standard does not apply to  of case. The case in Sonnington as well as Brown and Thomas is one in which the allegation is that the juror is taking an indication that the juror just didn't take the government's case for what it       that time, he did not take the government's case for what it was. And the judge did not discharge her at that time and   did not discharge her. Now, the inquiry was an inquiry to some extent. Certainly under the more liberal standard of any possibility. I think you would not prevail under that standard. That's the question. Do you agree with that? I don't think it's appropriate to rely on lay jurors' assessment of their own bias. Having said that, this was a very intelligent jury that understood the difference. But didn't the district court, the day after or the day before, file a memorandum in support of his decision. Actually, I don't want to say wait, perhaps, confused the earlier ruling somewhat by addressing really two separate issues and finding that there was ample evidence of bias but then also reaching a refusal to consider evidence issue here. These were matters that the court considered throughout and ultimately concluded that the juror had done both, that she had refused to deliberate and that she was biased against the FBI. And there was ample effort. But we've got high standard of proof here, effectively beyond a reasonable doubt standard of proof. And wouldn't you agree that the standard would be more difficult to reach with respect to one of those basings than it would be for the other? It really depends on the facts. Here, with regard to refusal to consider evidence issue, there was just ample statements in the record on which the judge relied. So you believe that the refusal to consider evidence issue likewise met this high standard of proof? Oh, absolutely. And this court said in Boone that a juror must deliberate. And here you have the book from White's office to the person that refused to look at what I was referring to, sat back in chair, closed eyes, and folding their arms across their chest. Another one, you just can't talk to her. She goes nuts. She starts banging on the table. She won't listen to us. She won't let anybody get a word in. That was the third. Actually, those were selections from different warehouse. The point is that the explanation of the jurors to 3011 evolved over time. Well, the questions in the first couple of colloquies were very limited, and the judge did not permit the jurors in any way to expand on their answers. The judge, as the jury was more comfortable with the process, the judge in the third colloquy did let them expand while still prohibiting them from discussing any substantive conversation that was going on in the jury room. The judge did it exactly right, and we do get more statements in the third colloquy. What we also see in the third colloquy is just this bubbling cauldron of frustration. This is a jury that has tried to deliberate with this woman for 10 days, and they've seen that it's not happening. As they said, she won't listen to evidence, and she's biased. One juror said it becomes more and more clear every day that there are preexisting biases that came into this jury room, and that's what she's not dealing with. How much bias would disqualify a juror once they went into deliberations? How much bias would   once they went into deliberations? Almost every juror has got a bias on something. Well, that's true. What this court has held very clearly is that a bias means a substantial impairment. It's a preexisting view that leads to a substantial impairment of being able to consider the case. That's really the prima facie standard that we need to apply. Judges across the country review jurors every day based on that definition. So they do that before they begin deliberating. Well, they rather excuse them in the middle of deliberation. Oh, absolutely. And this was a rare matter. This was unfortunate that this happened. But the judge had to deal with it. The judge is being told that somebody in the jury room has a preexisting bias. And it was his job, and this is where I'm going to get to, the standard of review here is clear error. This is a factual determination. This court has said most recently in Boone that it will defer to the district judge's handling of juror issues. Yes, clear error. But the overarching question is whether the standard is any possibility or reasonable possibility. Any possibility. It's a tough hurdle for the government to survive. It's sort of unfortunate that the judge here has been accused of trying to get a government verdict and trying to fork this juror off. And exactly the opposite happened. This judge tried to keep this jury together. This judge  that if you have to convince this panel that any experienced trial judge who spent six weeks in trial is going to want to do it all over again. Exactly. So you had a judge who was trying to get a verdict. He decided that this juror was being the problem she was based on the evidence and instead it was based on her refusal to deliver it. You talked about the superior position of the judge in evaluating bias. That's a statement that's been repeated by the court over and over again including yesterday by the Supreme Court. Yesterday the Supreme Court decided a case which involved a juror in a capital case and dismissal of a juror before the trial began for not being death qualified. And the 9th Circuit found that the trial judge had